# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00411-CV

**Gregory White, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-FM-01-007284, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this accelerated appeal, appellant Gregory White appeals the district court's order terminating his parental rights to his biological child T.S. following a jury trial. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2008). In three issues, White challenges the legal and factual sufficiency of the evidence to support the jury finding that his parental rights should be terminated. Because we conclude that the evidence is legally and factually sufficient to support the jury's finding, we affirm the trial court's order terminating his parental rights.

## BACKGROUND

The Department of Family and Protective Services first became involved with T.S. after Child Protective Services received a referral in October 2006 alleging physical abuse

and neglectful supervision of T.S. and his half-sister, A.S., by their mother. T.S., who was born January 7, 2005, was living with his mother and A.S. at the time.

The Department began its investigation. After T.S.'s mother tested positive for cocaine and marijuana, she voluntarily placed her children with a relative. As part of the Department's safety plan with her, the mother was not allowed to have unsupervised visits with her children. In February 2007, the Department received a referral that T.S. and A.S. were at their mother's residence and that they were alone and "playing in the glass from a broken out window." The Department sought and was granted temporary managing conservatorship of T.S. and A.S., and the children were moved to a foster home. Around that time, T.S.'s mother filed an affidavit with the trial court naming "Greg White" as T.S.'s father with an "unknown" address. The Department conducted an investigation to locate White, eventually locating him in approximately September 2007. After several attempts, the Department served White on November 14, 2007.

White attended a permanency hearing that occurred on November 30, 2007. By written order, the trial court extended the dismissal date of February 18, 2008 for 180 days, set the next permanency hearing for March 2008, and ordered White to "cooperate with the Department and follow all recommendations." White and his attorney signed the order, approving it as to form. White visited with T.S. for approximately one hour on the day of the hearing, but he did not see or contact T.S. again or attend other hearings prior to the jury trial in May 2008.

By the time of trial, T.S.'s mother had relinquished her parental rights, A.S.'s alleged father was deceased, and T.S. and A.S. were living with their maternal great aunt and uncle who hoped to adopt both children. The only issue then was White's parental rights to T.S. The

2

Department sought to terminate White's parental rights based on, among other grounds, constructive abandonment. *See* Tex. Fam. Code Ann. § 161.001(1) (N). The jury heard testimony from White; an undercover police officer; two friends of White; T.S.'s mother, maternal grandmother, and maternal great aunt; caseworkers from the Department; T.S.'s therapist; the guardian ad litem who was a CASA child advocacy specialist; and a legal secretary for the Travis County District Attorney's office.

White, who was twenty-two years old at the time of trial, testified to his relationship with T.S., to his relationship with his other child from a different mother, to his current incarceration, and to his plans for taking care of T.S. Although T.S. never lived with White, White testified that he spent time with T.S. until August 2006 and at the one-hour visit on November 30, 2007. He testified that he loved T.S. and that, given time, he could take care of T.S., but he was not sure how much time he needed. He testified that T.S. was "loved" and in a "stable home" in his current placement with his maternal great aunt and uncle, "but, in the future, I think that it would be in his best interest that his father is still around and his father could still be his father." White testified that his mother abandoned him when he was twelve, that he did not know who his father was, that he "got in some trouble with the law" when he was growing up, that he was in jail in 2006 for "burglary of a habitation," that he had been "homeless" and "never had my own place" since 2006, that he did not have transportation, and that he had not paid child support for either of his children, but that he had been employed by a cleaning company and at a store and that he had applied for a job with a hospital before being arrested in February 2008.

As to White's incarceration at the time of trial, the undercover police officer testified to the criminal charges that were pending against White. The officer testified that he had purchased crack cocaine from White. When White was questioned about the pending criminal charges against him, White invoked the Fifth Amendment. One of White's friends testified that he was willing to post bond for White, and that White would be "welcome back" to work at the cleaning company when he was released from jail. Although his friend was willing to post bond pending the resolution of the criminal charges against him, White testified that he did not accept his friend's offer.

T.S.'s mother testified to her relinquishment of her parental rights and to T.S.'s relationship with White. She testified that White's contact with T.S. was limited and ceased altogether in August 2006, that White knew where T.S. was if he had wanted to see him, that White "just never made an effort," that White did not pay her child support, and that White knew that CPS had custody of T.S. and A.S., but that White did not want CPS to know where he was because he did not want to pay child support. T.S.'s mother also testified that she did not like the way White treated T.S. when he did see him. She testified that when T.S. was one-year-old, White made him sit still all day and, if T.S. made a mistake, White gave him a "whooping" with his hand.

T.S.'s maternal grandmother testified that she assisted CPS in locating White, eventually providing White's contact information, and that she told White what had happened with T.S. and that CASA needed to speak with him. The maternal great aunt testified to her relationship with T.S. and A.S., that she and her husband hoped to adopt both T.S. and A.S., and that she was willing for T.S. to know his father in the future.

4

The legal secretary for the Travis County District Attorney's office testified to the searches that she conducted to locate White and that she "did everything that [she] could do with the information [she was] provided to find Greg White" and that she felt that she "made diligent efforts." She also testified to the eventual location of White, the constable's repeated attempts to serve White, and the eventual service of White.

The conservatorship caseworker for the Department testified to his involvement with White and T.S. He testified that he spoke with White at the hearing in November 2007, giving White his contact information, setting up an appointment with White for December 6, 2007, and telling White that White needed to contact him to set up weekly visits with T.S.; that White did not appear for the appointment or otherwise contact him; that he was unsuccessful in his attempts to contact White after the scheduled appointment until March 2008 when he discovered that White was in jail; that he went to see White in jail twice before the trial; and that White did not attempt to contact him at any time.

The guardian ad litem testified to the Department's placements of T.S. and A.S., including the current placement with their maternal great aunt and uncle, to the progress that T.S. had made after the Department became involved, to her understanding that White was aware in September 2007 that T.S. and A.S. were in CPS custody, and to her opinion that the Department had made reasonable efforts to reunite the family. She also testified that she attended the December 6, 2007, appointment that White failed to attend and that her first visit with White was when she went with the caseworker to see White in jail in April 2008.

5

The jury was instructed as to the required grounds for finding that White's parental rights should be terminated:

For the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that at least one of the following events has occurred:

1. GREG WHITE has knowingly placed or knowingly allowed [T.S.] to remain in conditions or surroundings which endangered the physical or emotional well-being of [T.S.]; or

2. GREG WHITE has engaged in conduct or knowingly placed [T.S.] with persons who engaged in conduct which endangered the physical or emotional well-being of [T.S.]; or

3. GREG WHITE constructively abandoned [T.S.] who has been in the permanent or temporary managing conservatorship of the Department for not less than six months and

   i. the Department has made reasonable efforts to return [T.S.] to GREG WHITE, and

   ii. GREG WHITE has not regularly visited or maintained significant contact with [T.S.], and

   iii. GREG WHITE has demonstrated an inability to provide [T.S.] with a safe environment.

In addition, you must find by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of [T.S.].

The jury found unanimously that White's parental rights should be terminated. Based on the jury's finding, the trial court entered an order terminating White's parental rights. This appeal followed.

6

**ANALYSIS**

To terminate White's parental rights, the Department had the burden to prove the elements of one of its three alleged grounds pursuant to section 161.001(1) of the family code and that termination was in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2). In his three issues, White does not challenge that termination was in T.S.'s best interest but he urges that the evidence was legally and factually insufficient to support each of the three alleged grounds pursuant to section 161.001(1) of the family code. Because the Department had to prove only one of the three alleged grounds, we limit our review to the constructive abandonment ground as it is dispositive.[1] *See id.*; *In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.).

***Standard of Review***

The standard of proof to terminate parental rights is the clear and convincing standard. Tex. Fam. Code Ann. § 161.206(a) (West Supp. 2008); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parent termination

---

[1] The other two grounds that the Department alleged were subsections (D) and (E) of section 161.001(1) of the family code:

(D)    knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E)    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; . . .

*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2008).

cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

In reviewing the legal sufficiency of the evidence to support a termination finding, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review," a reviewing court "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. A court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. If a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id*.

In reviewing the factual sufficiency of the evidence to support a termination finding, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. (citing *In re C.H.*, 89 S.W.3d at 25). The court should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually

8

insufficient." *Id*. In reviewing termination findings for factual sufficiency, a court "should not supplant the jury's judgment with its own." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

***Constructive Abandonment***

Section 161.001(1)(N) of the family code provides the required elements to support termination on the ground of constructive abandonment. *See* Tex. Fam. Code Ann. § 161.001(1)(N). Section 161.001(1)(N) provides:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1)  that the parent has:
>
> \* \* \*
>
> (N)  constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
> > (i)  the department or authorized agency has made reasonable efforts to return the child to the parent;
> >
> > (ii)  the parent has not regularly visited or maintained significant contact with the child; and
> >
> > (iii)  the parent has demonstrated an inability to provide the child with a safe environment; . . .

*Id*.; *see also In re J.J.O.*, 131 S.W.3d at 628-30 (holding evidence sufficient to support finding of constructive abandonment); *In re H.R.*, 87 S.W.3d 691, 699-700 (Tex. App.—San Antonio 2002, no pet.) (holding evidence sufficient to support finding that mother constructively abandoned child).

9

In his issue addressing constructive abandonment, White does not challenge the sufficiency of the evidence to support that T.S. had been in the managing conservatorship of the Department for not less than six months or that White did not regularly visit or maintain contact with T.S. White challenges the evidence to support that he has demonstrated an inability to provide T.S. a safe environment, and he appears to challenge the evidence to support that the Department made reasonable efforts to return T.S. to him. We turn first to a review of the evidence as to White's demonstrated inability to provide T.S. a safe environment. *See* Tex. Fam. Code Ann. § 161.001(1)(N)(iii).

Viewing the evidence in the light most favorable to the finding, White testified that he was "homeless" and unemployed prior to being incarcerated, that he did not have transportation, that he had failed to pay child support for either of his children, and that he did not know how much time he needed before he would be able to care for T.S. He also testified to being in "trouble with the law" growing up and he invoked the Fifth Amendment when questioned concerning the current criminal charges that were pending against him. Tex. R. Evid. 513(c); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (per curiam) (jury in civil case may "draw negative inferences from [ ] repeated invocations of the Fifth Amendment"). The undercover police officer testified that he purchased crack cocaine from White. The guardian ad litem testified that, in her opinion, White was not able to provide a safe environment for T.S.:

Q.  Do you feel that Mr. White has shown that he's willing or able to be a parent to [T.S.]?

A.  No.

10

* * *

Q. What is your opinion about Mr. White's ability to provide a safe, stable environment for [T.S.]?

A. Well, I don't—I haven't heard a concrete plan. If I look at history, I haven't seen any stability in his life.

She also testified that when she talked with him in April 2008, White "didn't have a plan." There was also evidence that White had not worked since November or December 2007, that he had not attempted to contact the Department, and that he had not complied with the court's orders. We conclude that the evidence was such that a reasonable fact finder could have formed a firm belief or conviction that White had demonstrated an inability to provide T.S. with a safe environment. *See In re J.F.C.*, 96 S.W.3d at 266.

Viewing all of the evidence, White contends that, although he was incarcerated, he had a "plan to provide his child a safe environment." He contends that he presented evidence of the places that he had stayed before being incarcerated and that the Department did not present evidence that these places were unsafe for T.S. He also contends that he introduced evidence that two of his friends were willing to help him by allowing him to stay with them upon his release from jail, that one of them was willing for T.S. to live with him until White was released from jail, and the Department did not provide evidence that White's friend would be an "inappropriate caretaker." But, White's friend testified that White only asked him on the day that his friend testified if he would be willing to care for T.S., that he had never met T.S., and that he had mixed emotions about it:

11

Q. And there has been testimony that if [T.S.]—if Mr. White keeps his parental rights and T.S. had to be moved from where he is, that [T.S.] could come and live with you.

A. Yes, ma'am.

Q. Are you willing to let that happen?

A. I am willing to let that happen if—but we have to—we have to figure out the whole situation. I do believe that a child should have his father, but shouldn't be separated from his family.

Q. Okay, so you have mixed motions [sic] about it.

A. Yes, ma'am.

*See In re H.R.M.*, 209 S.W.3d at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005)) (jury is the "'sole arbiter when assessing the credibility and demeanor of witnesses'"). White also testified that his first choice was for the maternal great aunt and uncle who were caring for T.S. to continue doing so "until he was able to get on his feet." As to the prior places that he stayed, White did not testify to the last name of at least one of the people at whose house he stayed and, in any event, he did not testify that he planned to return to any of those places or that T.S. would be welcome or safe. On this record, we conclude that a reasonable juror could have formed a firm belief or conviction that White had demonstrated an inability to provide T.S. a safe environment. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude that the evidence was both legally and factually sufficient to support that White demonstrated an inability to provide T.S. a safe environment. *See* Tex. Fam. Code Ann. § 161.001(1)(N)(iii).

To support termination pursuant to section 161.001(1)(N), the Department also had to show that it had made "reasonable efforts" to return T.S. to White. *See id*. § 161.001(1)(N)(i).

12

Although it is not clear White has presented this issue for our review, *see* Tex. R. App. P. 38.1(e), (h), in the interest of justice, we review the factual and legal sufficiency of the evidence to support this inferred finding. Viewing the evidence in the light most favorable to the finding, witnesses for the Department provided testimony to the Department's efforts to locate White and, after he was located, to serve him, to maintain contact with him, and to provide assistance to him. The conservatorship caseworker testified that he met with White on November 30, 2007, providing his contact information, setting up a meeting for December 6, 2007, and advising White to contact him to set up visits with T.S.; that, after White failed to attend the December 6, 2007, meeting, that he continued to try to contact White; and that, after he discovered White was in jail in March 2008, that he visited him twice before the jury trial. The guardian ad litem testified without objection that, in her opinion, "the Department had made reasonable efforts to reunite this family."

Viewing all the evidence, White contends the Department failed to show that it made reasonable efforts to return T.S. to him because White was served only six months before the trial. There was evidence that White was aware in September 2007 that CPS had custody of T.S., but that White did not want CPS to know where he was because he did not want to pay child support, that White made no effort to see or contact T.S. except for the one-hour visit during the time period August 2006 to May 2008, that White failed to attend court hearings, and that White failed to follow the court's order from the November 30, 2007, hearing to "cooperate with the Department and follow all recommendations." We conclude that the evidence was both legally and factually sufficient to support that the Department made reasonable efforts to return T.S. to White. *See In re J.F.C.*, 96 S.W.3d at 266.

13

## CONCLUSION

Because we conclude that the evidence is legally and factually sufficient to support the jury's finding to terminate White's parental rights, we affirm the trial court's order of termination.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   December 19, 2008

14